IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Amanda Morrison, et al.,                  :        Case No. 1:03cv755
                                          :
                 Plaintiffs,              :        District Judge Susan J. Dlott
                                          :
        v.                                :        ORDER DENYING PLAINTIFFS'
                                          :        MOTION TO STRIKE, DENYING
Board of Trustees of Green Township, et al.,  :    DEFENDANTS' MOTION TO
                                          :        STRIKE, GRANTING HAMILTON
                 Defendants.              :        COUNTY DEFENDANTS' MOTION
                                          :        FOR SUMMARY JUDGMENT, AND
                                          :        GRANTING IN PART AND
                                          :        DENYING IN PART GREEN
                                          :        TOWNSHIP DEFENDANTS'
                                          :        MOTION FOR SUMMARY
                                                   JUDGMENT


        This matter comes before the Court on the motions for summary judgment of the Green

Township and Hamilton County Defendants.  (Docs. 74, 75.)  Also before the Court are two

related motions: Plaintiffs' Motion to Strike References to No Contest Pleas (doc. 86) and

Defendants' joint motion to strike the affidavit of George Kirkham (doc. 93).

        Amanda Morrison, her father Dennis, and her mother Cynthia brought this lawsuit

against the Board of Trustees of Green Township ("Green Township"), the Board of County

Commissioners of Hamilton County ("Hamilton County"), the Green Township Police

Department, the Hamilton County Sheriff's Department, Green Township officers Scott

Celender and Dan Eagle, Hamilton County officers Michael Hopewell and Dave Luke, and

unknown police officers and political subdivisions or agencies.  (Doc. 26.)[1]  Amanda and Dennis

---

[1]  Defendants argue in their motions for summary judgment that the Green Township
Police Department and Hamilton County Sheriff's Department are not suitable entities for suit.

Morrison assert claims for excessive force, seizure without probable cause, failure to train, and

failure to discipline under 42 U.S.C. § 1983.[2]  Amanda and Dennis Morrison also assert state law

claims for assault and battery; false arrest; false imprisonment; intentional infliction of emotional

distress; outrageous conduct; invasion of privacy; civil conspiracy; negligence; gross negligence;

and negligent hiring, retention, and supervision.  Cynthia Morrison claims she has suffered and

continues to suffer mental anguish, emotional distress, and physical pain and suffering as a result

of the Defendants' conduct.

Defendants move for summary judgment on all the claims against them, and Plaintiffs

oppose those motions.[3]  For the reasons that follow, the Court denies Plaintiffs' motion to strike,

denies Defendants' motion to strike, grants in part and denies in part the motion for summary

judgment of the Green Township Defendants, and grants the motion for summary judgment of

the Hamilton County Defendants.

## I.    BACKGROUND

Shortly after noon on October 30, 2002, Amanda Morrison's sister called 911 and

reported that Amanda, nineteen years old, had a knife and was trying to kill herself.  (A.

---

(Doc. 74 at 20; doc. 75 at 30.)  Plaintiffs concede this point.  (Doc. 87-2 at 2, 24 n.5.)
Accordingly, any claims alleged against the Green Township Police Department and Hamilton
County Sheriff's Department are deemed to be voluntarily dismissed.

[2]  Both Amanda and Dennis Morrison point to the Fourth, Fifth, and Fourteenth
Amendments as bases for their § 1983 claims.  (Doc. 26 ¶¶ 33, 48.)  In its motion for summary
judgment, the Green Township Defendants seek dismissal of Dennis Morrison's First
Amendment claim.  (Doc. 74 at 26.)  The Court will not discuss the merits of any such argument
as there is no First Amendment claim asserted in the Amended Complaint.

[3]  In their opposition memorandum, Plaintiffs requested oral argument pursuant to S.D.
Ohio Civ. R. 7.2(b)(2).  Upon its review of the legal memoranda, the Court concludes that oral
argument is not essential to the fair resolution of the case.  Neither the factual nor legal issues
presented are of such complexity as to make oral argument of utility.

Morrison Dep. Ex. A, 911 tape recording.)  The Hamilton County dispatcher issued a Priority 1 call for officers to respond to a psychological emergency at the Morrison residence.  (Celender Dep. Ex. 6.)  Moments later, dispatch received another call from the Morrison residence telling them to disregard the earlier emergency call.  (Hopewell Dep. 149-50.)  Nonetheless, Mike Hopewell ("Deputy Hopewell"), a Hamilton County Deputy Sheriff, continued to the Morrison house to investigate.

When Deputy Hopewell arrived at the scene, he saw Amanda Morrison outside a neighbor's house.  She was not wearing shoes or a jacket even though it was a cold October afternoon.  Deputy Hopewell spoke with Amanda, and she told him that she had been arguing with her mother and had told her, "I could just kill myself."  (A. Morrison Dep. 105.)  Officer Celender of the Green Township Police then arrived at the scene.[4]

Via a shoulder-mounted radio, Deputy Hopewell told Officer Celender to go to the Morrison house to question the family.  (Celender Dep. 208.)  Officer Celender did so and talked to Amanda's mother, Cynthia.  According to Officer Celender, Cynthia Morrison told him that Amanda had a knife to her wrist, had threatened suicide, and was taking Paxil.  (*Id*. at 227; *see also* Investigation Report, Dep. Ex. 9 at 2.)  Cynthia Morrison contradicts Officer Celender's

_____

[4] Green Township is a political subdivision located in Hamilton County, Ohio.  The Township, through its Board of Directors, operates its own police department.  The Green Township Police Department and the Hamilton County Sheriff's Department are parties to a Joint Operating Agreement, which merges the function of the two departments with respect to calls within the Township's jurisdiction.  (Eagle Dep. 35.)  On October 30, 2002, Defendant Dan Eagle was the highest-ranking Green Township officer at the scene.  (*Id*. at 31, 33.)  However, under the Joint Operating Agreement, Hamilton County Lieutenant David Luke had supervisory authority over all the officers, including Defendant Eagle.  (*Id*. at 45.)  The two departments employ their own respective use of force policies and operate under their own use of force guidelines.  (West Dep. 108-114.)

testimony, claiming that he did not ask her any questions but only said to her, "I need Amanda's shoes and jacket. We're taking her to U.C." (C. Morrison Dep. 39.) Officer Celender got Amanda's shoes and jacket from her mother and went down the street to speak with Deputy Hopewell, who was still standing in the neighbor's yard with Amanda. (*Id*. at 42; A. Morrison Dep. 93.) Officer Celender threw Amanda the shoes and jacket, and she put on the shoes. (A. Morrison Dep. 93.)

The parties disagree about the subsequent chain of events. Deputy Hopewell testified that he told Amanda he would have to take her to the hospital for a psychiatric evaluation. (Hopewell Dep. 77, 86-87.) Despite this, according to Defendants, Amanda got up and began to run toward her house after she put on her shoes. (*Id*. at 92; Celender Dep. 265.) Officer Celender shouted at Amanda to stop running and began to chase her. (Celender Dep. 266.) Amanda, who is 5'2" and weighed 176 pounds, ran between sixty and one hundred feet before Officer Celender caught up with her and grabbed her by the shoulders, pulling her to the ground. (*Id*. at 267, 270.) Officer Celender then handcuffed Amanda. (*Id*. at 272.) Amanda began complaining of a pain in her ankle, and Officer Celender called for a life squad to assess her injury. (*Id*. at 285.)

In contrast to the officers' description of the events, Amanda testified at her deposition that she put on her shoes, told Deputy Hopewell that she was going to her house, and walked "with longer strides," but did not run, from the officers. (A. Morrison Dep. 95, 97.) Amanda testified that she did not ask permission to leave the scene because Deputy Hopewell told her she could leave as soon as Officer Celender returned from her house. (*Id*. at 92, 95-6.) She denies that Deputy Hopewell told her they were taking her to the hospital for an evaluation. (*Id*. at

4

106.)  Amanda claims that after she started walking, Officer Celender tackled her to the ground

without warning and handcuffed her.  (*Id*. at 100.)  Amanda testified that every time she tried to

talk to Officer Celender, he pushed her face down into the ground. (*Id.* at 115.)

At this point, Cynthia Morrison came out of her house to see Officer Celender on top of

Amanda.  (C. Morrison Dep. 47.)  Cynthia ran to Amanda and noticed that the handcuffs were

pinching Amanda's skin, causing it to turn black and blue.  (*Id*. at 52.)  Both Cynthia and

Amanda Morrison asked the officers to loosen Amanda's handcuffs.  (*Id*.; A. Morrison Dep.

118.)  Officer Celender refused to loosen the handcuffs.  (A. Morrison Dep. 118.)  Officer

Celender testified that he checked Amanda's handcuffs to ensure that they were not too tight by

sticking his finger in between her flesh and the handcuff.  (Celender Dep. 277.)  Officer Celender

stayed beside Amanda until the paramedics arrived.

Meanwhile, Lieutenant Luke, a Hamilton County Deputy Sheriff, and Sergeant Eagle, a

Green Township police officer, arrived on the scene, followed by Dennis Morrison, Amanda's

father.[5]  Dennis Morrison had left work after receiving word that there was an emergency at his

house and that "something about suicide was mentioned."  (D. Morrison Dep. 15.)  When Dennis

Morrison arrived, he got out of his car, identified himself to the officers present, and attempted

to approach Amanda.  Deputy Hopewell and Officer Celender stopped Dennis Morrison as he

approached Amanda.  (*Id*. at 42.)  Dennis Morrison testified that Officer Celender pushed him

and told him to shut up and calm down.  (*Id*. at 43.)  When Dennis Morrison continued to ask

---

[5]  The parties dispute whether the paramedics were on the scene when Dennis Morrison
arrived.  According to Morrison, the paramedics were not present (D. Morrison Dep. 41);
according to Deputy Hopewell, the paramedics were in the process of providing medical
treatment to Amanda (Hopewell Dep. 106); according to Officer Celender, the paramedics
arrived just moments before Dennis Morrison (Celender Dep. 304).

5

what was going on, Officer Celender again pushed him, at which point Morrison told Celender to "keep his hands off [him.]"  (*Id*. at 47.)

Meanwhile, the paramedics were attending to Amanda.  Dennis Morrison claims that the officer standing nearest Amanda told her to "shut up" when she tried to speak to the paramedics and, in response, Dennis Morrison told the officer that Amanda could tell the paramedics about her injury.  (*Id*. at 48.)  At that point, someone ordered Officer Hopewell to "get him [Dennis Morrison] out of there."  Officer Hopewell asked Dennis Morrison to walk to the car and grabbed him around the neck.  (*Id*. at 48-49.)  Officer Hopewell then, possibly with the assistance of other officers, threw Dennis Morrison to the ground.  (*Id*. at 58.)  Three officers held Dennis Morrison flat on the ground, and one ordered him to put his hands behind his back.  (*Id*. at 59, 65.)  An officer then pried Dennis Morrison's hand open, twisted and bent his middle finger and index finger, and cuffed him.  (*Id*. at 65.)  Dennis Morrison testified that he did not struggle with the officers and did not resist, but that he could not put his arms behind his back because of his awkward position.  (*Id*.)  The officers then escorted Dennis Morrison to the back of the Sheriff's cruiser.  (*Id*. at 67, 71.)  According to Dennis Morrison, no one advised him that he was being charged with a crime until he was released from the police cruiser.  (*Id*. at 71.)

Defendants characterize Dennis Morrison's behavior upon arriving at the scene as "belligerent."  (Hopewell Dep. 108.)  Deputy Hopewell testified that Dennis Morrison continued to push toward the scene despite the officer's effort to keep distance between Dennis Morrison and Amanda.  (*Id*. at 109.)  Deputy Hopewell stated that Dennis Morrison was drawing the attention of the other officers, as well as the paramedics, away from Amanda.  (*Id*.; *see also* Celender Dep. 310.)  As a result, Deputy Hopewell asked Dennis Morrison to "step back"

roughly ten times, to no avail, and that Sgt. Luke then ordered Hopewell to "get him [Dennis Morrison] out of here." (Hopewell Dep. 110-12.) Deputy Hopewell testified that he told Dennis Morrison repeatedly that he would be arrested if he continued to interfere but that Morrison wasn't listening to him. (*Id*. at 112.) According to Deputy Hopewell, as he attempted to steer Dennis Morrison away from the area, Morrison came toward him in an aggressive manner, at which point he notified Morrison that he was under arrest. (*Id*. at 113.) Deputy Hopewell then attempted to place Morrison's hands behind his back, but Morrison pulled away. (*Id*. at 114.) Deputy Hopewell forced Dennis Morrison to the ground with the assistance of Sgt. Eagle and Officer Celender. (*Id*. at 116, 118-20.) After Dennis Morrison was on the ground, Deputy Hopewell ordered him to put his hands behind his back. When Morrison did not comply, Deputy Hopewell threatened to spray him with mace, after which Morrison complied and the officers were able to handcuff him. (*Id*. at 124-25; D. Morrison Dep. 65.)

Amanda and Cynthia Morrison testified that during Dennis Morrison's struggle with the officers, they observed Officer Celender twist Mr. Morrison's finger until it broke. (A. Morrison Dep. 141; C. Morrison Dep. 89-91.) Mr. Morrison did not complain of any injuries at the scene but later went to the emergency room to have his finger examined. (D. Morrison Dep. 118-120.) Dennis Morrison was diagnosed with a "volar plate fracture" of his right index finger, which was placed in a splint for several weeks. (Doc. 74 Ex. B.)[6]

Deputy Hopewell wrote Dennis Morrison a citation for disorderly conduct under Ohio Rev. Code § 2917.11 and released him after he had spent approximately thirty minutes in the

---

[6] Defendants characterize a volar plate fracture as a non-serious ligament injury, usually sustained by "jamming" the finger. (Doc. 74 at 13.)

police car.  (Hopewell Dep. 135-37)  Mr. Morrison subsequently pled no contest to the charge on April 16, 2003 and paid the fine.  (Doc. #74 Ex. A.)

The paramedics treated Amanda at the scene for a sprained ankle and then transported her to the hospital.  She was released to her family later that day.  The police cited Amanda for resisting arrest and obstructing official police business.  The charge of resisting arrest was dismissed, and she pled no contest to a charge of attempted obstruction of official police business under Ohio Rev. Code § 2923.02, paying the accompanying fine.  (A. Morrison Dep. 127.)  Plaintiffs subsequently filed the instant lawsuit.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a

8

genuine issue for trial." Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## III.    ANALYSIS

### A.    Motions to Strike

Before considering the merits of the summary judgment motions, the Court must resolve Plaintiffs' Motion to Strike References to No Contest Pleas (doc. 86) and Defendants' Motion to Strike the Affidavit of Dr. George Kirkham (doc. 93).

#### 1.    Plaintiffs' Motion to Strike References to No Contest Pleas

Plaintiffs' Motion to Strike presents two issues: (1) whether, under Federal Rule of Evidence 410, Defendants can introduce evidence of Plaintiffs' *nolo contendere* (no contest) pleas to disorderly conduct and resisting arrest to defend themselves against Plaintiffs' subsequent civil claim attacking the validity of their arrest; and (2) whether the fact that Plaintiffs have had the records of their criminal proceedings sealed and expunged pursuant to Ohio Rev. Code § 2953.32 prohibits Defendants from using these records as evidence in the case at hand.

As to the first issue, Federal Rule of Evidence 410 states that evidence of a plea of *nolo contendere* is not, "in any civil or criminal proceeding, admissible *against the defendant* who made the plea." Fed. R. Evid. 410 (emphasis added).  However, Rule 410 does not bar a court from considering such a plea in cases where the defendant who previously pled "no contest" in a criminal action subsequently brings a civil suit attacking the validity of his arrest. *Walker v.*

*Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988).[7]  In *Walker*, the Sixth Circuit concluded that such a

case did "not present the kind of situation contemplated by Rule 410: the use of a *nolo*

*contendere* plea against the pleader in a subsequent civil or criminal action in which he is the

*defendant.*"  *Id*. at 143 (citing *United States v. Manzella*, 782 F.2d 533 (5th Cir. 1986), *cert.*

*denied*, 476 U.S. 1123); *see also Shelton v. City of Taylor*, 92 F. App'x 178, 183, 2004 WL

231777, at *4 (6th Cir. 2004) (affirming *Walker* and "declin[ing] to allow Rule 410 to become an

offensive weapon and thereby undermine its basic purpose: to promote settlement by ensuring

that a defendant need not fear later repercussions from cooperating with the judicial system").

Thus, under well-settled law in this Circuit, Federal Rule of Evidence 410 does not prohibit this

Court from considering the no contest pleas of the Plaintiffs when offered as evidence that the

officers had probable cause to arrest them.

As to the second issue, Ohio Rev. Code § 2953.32 provides that "a first offender may

apply to the sentencing court if convicted in this state, or to a court of common pleas if convicted

in another state or in a federal court, for the sealing of the conviction record."  Ohio Rev. Code §

2953.32 (A)(1).  If a court determines that an individual's conviction record should be sealed,

"[t]he proceedings in the case shall be considered not to have occurred and the conviction or bail

forfeiture of the person who is the subject of the proceedings shall be sealed. . . ."  Ohio Rev.

---

[7]    In *Walker*, two men were arrested for disorderly conduct and reckless driving.  Both
arrestees pled "no contest," were found guilty, and paid fines in state court.  Subsequently, the
arrestees sued the police officers under 42 U.S.C. § 1983 for "false arrest, detention, and
imprisonment in violation of their constitutional rights."  *Walker*, 854 F.2d at 139.  The police
officers moved for summary judgment, the district court denied the motion, and the officers
appealed.  The Sixth Circuit concluded that the officers' actions were within the scope of the
doctrine of qualified immunity and that their motion for summary judgment should have been
granted.

Code § 2953.32 (C)(2). A number of statutory exceptions, however, permit the examination and use of previously sealed and expunged records by certain individuals and in specific types of circumstances. For example, Section 2953.32(D)(4) states that "[i]nspection of the sealed records included in the order may be made . . . by . . . a law enforcement officer who was involved in the [criminal] case, for use in the officer's defense of a civil action arising out of the officer's involvement in that case." Ohio Rev. Code § 2953.32(D)(4).

Plaintiffs argue that Section 2953.32 permits Defendants to "inspect" the sealed records but not use the information as evidence. Such a reading would render the statutory grant of authority under subsection (D) superfluous. The Ohio Supreme Court, recognizing as much, has explained that the ability to inspect records for the uses set forth in Section 2953.32(D) includes the ability to actually use those records to further the purposes for which they were inspected. *State v. Bissantz*, 40 Ohio St.3d 112, 115, 532 N.E.2d 126 (Ohio 1988) (noting that Section (D) permits certain individuals to inspect sealed records and that "[o]bviously, these interested parties could act to bar an individual's future effort to run for election to public office" based on information obtained from the sealed records). Accordingly, pursuant to Ohio Revised Code Section 2953.32(D)(4), Defendants are entitled to use the sealed records in their defense of this civil action against them, and Plaintiffs' motion to strike is denied.

### 2. Defendants' Motion to Strike the Affidavit of Dr. George Kirkham

Plaintiffs support their opposition to Defendants' motions for summary judgment with the affidavit of Dr. George Kirkham, Plaintiffs' designated expert witness. (Kirkham Aff., Doc. 87-8.) Dr. Kirkham's opinions address the issues of use of force against Amanda and Dennis and the failure to train/failure to investigate of Green Township and the Hamilton County

Sheriff's Office.[8]  Defendants move to strike Dr. Kirkham's affidavit, arguing that it contains

inadmissible and irrelevant opinions about the degree of force used by the officers (doc. 93 at 3),

it contains opinions about the policy and practice of Green Township and Hamilton County that

lack foundation and are conclusory (*id*. at 6), it is an undisclosed supplemental expert report, and

it refers to papers that are not attached thereto.

      Federal Rule of Civil Procedure 56(e) governs the use of affidavits in support or

opposition to a motion for summary judgment and provides:

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in
> evidence, and shall show affirmatively that the affiant is competent
> to testify to the matters stated therein.  Sworn or certified copies of
> all papers or parts thereof referred to in an affidavit shall be
> attached thereto or served therewith.

Fed. R. Civ. P. 56(e).  Dr. Kirkham states in his affidavit that he has personal knowledge about

the matters in the affidavit, that he is qualified as an expert on the subject of law enforcement

standards and procedures,[9] and that he examined various documents and exhibits produced by

the parties to this litigation including the pleadings, deposition transcripts, discovery responses,

and departmental policy and training information.  (Kirkham Aff. ¶¶ 1-5.)  Dr. Kirkham recites

---

    [8]  Dr. Kirkham does not express an opinion concerning the issue of the officers'
entitlement to qualified immunity, nor could he as "the issue of whether qualified immunity is
applicable to an official's actions is a question of law."  *Dickerson v. McClellan*, 101 F.3d 1151,
1157 (6th Cir. 1996) (*citing Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir. 1991), *cert.
denied*, 502 U.S. 1060 (1992)).  Qualified immunity questions involve a two-part analysis: first,
whether the facts alleged show the officer's conduct violated a constitutional right; and second,
whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  While Dr.
Kirkham obliquely opines that the officers violated the Fourth Amendment, he expresses no
opinion as to whether the right allegedly violated was clearly established.

    [9]  Defendants do not challenge Dr. Kirkham's status as an "expert" for the purposes of
their motion.  (Doc. 93 at 4.)

in his affidavit the events that occurred on the day of the arrests–from the Plaintiffs'

perspective–and then renders opinions concerning the Defendants' conduct.  The issue is

whether Dr. Kirkham's affidavit satisfies the criteria of Rule 56(e) with respect to expert opinion

on the issues of use of force and political subdivision liability under 42 U.S.C. § 1983.

       The Court finds that it has no need to consider Dr. Kirkham's opinions with respect to the

reasonableness of force used against Amanda and Mr. Morrison because, as described later in

this opinion, the officers are entitled to qualified immunity on all issues except that of Officer

Celender's handcuffing of Amanda and pushing her head into the ground–issues upon which Dr.

Kirkham did not specifically opine.  Thus, the motion to strike as it pertains to opinions on

excessive force is moot.

       As to Dr. Kirkham's opinion concerning the policies, training, and failure to investigate

on the part of Green Township and the Hamilton County Sheriff's Office, the Court finds that the

affidavit satisfies the criteria set forth in Rule 56(e).  "When . . . an expert's affidavit is

submitted in opposition to a motion for summary judgment, the affidavit must set forth specific

facts from the record to support its conclusions."  *Daniels v. American Honda Motor Co.*, 980

F.2d 729, 1992 WL 361271, at *4 (6th Cir. Dec. 7, 1992).  The opinions set forth in Dr.

Kirkham's affidavit concerning the adequacy of training are based on his review of

"departmental policy and training information which has been . . . provided to me" (Kirkham

Aff. ¶ 5), the deposition transcript of Green Township officer Sergeant Eagle in which he

testified that his department had no written policies or standard practices for handling

emotionally disturbed persons (*id.* ¶ 11), and the deposition transcript of Hamilton County

officer Lieutenant Coyle in which he testified that he could not recall any in-service training

conducted by his agency regarding the appropriate law enforcement response to calls regarding emotionally disturbed persons (*id.*). These are factual predicates; Dr. Kirkham's opinions are not purely unsupported speculation as the defendants suggest. Thus, Dr. Kirkham's affidavit, insofar as it concerns the issue of failure to train, satisfies Rule 56(e)'s criteria for affidavits in opposition to a motion for summary judgment.

Defendants argue the affidavit should be stricken because it is conclusory and cite numerous cases which they claim support the argument. (*See* doc. 93 at 5, 7, citing, *inter alia*, *Williams v. Ford Motor Co.*, 187 F.3d 533 (6th Cir. 1999); *Daniels v. American Honda Motor Co., Inc.*, 980 F.2d 729 (6th Cir. 1992); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000); and *Doren v. Battle Creek Health Sys.*, 187 F.3d 595 (6th Cir. 1999)). However, these cases discuss what is required of an affidavit if it is to *defeat a motion for summary judgment*. *See*, *e.g.*, *Williams*, 187 F.3d at 544 (quoting with approval *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993), which held that "[w]here an expert presents 'nothing but conclusions–no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected,' such testimony will be insufficient to defeat a motion for summary judgment.")

Whether an affidavit should be stricken from the record and whether it is sufficient to defeat a motion for summary judgment are two different matters. *See Monks v. General Electric Co.*, 919 F.2d 1189, 1192-93 (6th Cir. 1990) ("[T]he issue of the admissibility of an expert's affidavit is distinct from the issue of whether the affidavit is sufficient to withstand a summary judgment motion."). "[M]ere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than its admissibility.'" *McLean*, 224 F.3d at 801 (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)). Dr. Kirkham's

opinion is but one item of evidence in the overall question of whether Plaintiffs have met their burden of demonstrating § 1983 liability on the part of the Defendants for failure to train.  As is explained below, Dr. Kirkham's opinion is insufficient to create a genuine issue of material fact on the issue.

Finally, the Court declines to strike the affidavit as violative of Fed. R. Civ. P. 26(a), 37(c)(1), or 56(e).  While Dr. Kirkham's affidavit includes opinions that were not disclosed in the originally served expert report, those opinions were based in part on the depositions of Lt. Nick Coyle, Hamilton County, and Bart West, Green Township, which were taken after the expert report deadline because of a *joint request* to extend the discovery deadlines.  Also, the documents referenced by Dr. Kirkham in his affidavit but not attached thereto have been served to Defendants and are in the record.  Perhaps most important, any failure on the part of Plaintiffs to earlier disclose Dr. Kirkham's opinions is harmless, as the Court has concluded that the affidavit fails to create a genuine issue of fact on the matters on which Dr. Kirkham opines.

## B.    Plaintiffs' Claims Under 42 U.S.C. § 1983

### 1.    Claims Against Green Township and Hamilton County, and Official Capacity Claims Against the Named Defendants

Moving now to the merits of Defendants' motions for summary judgment, the Court first addresses Plaintiffs' § 1983 claims against Green Township, Hamilton County, and all named Defendants in their official capacities.[10]  A city or municipality may be "liable under § 1983 only

---

[10]  The Court construes all official capacity claims as claims against the municipality. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) ("A suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability

15

where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Respondeat superior is not available as a theory of recovery under § 1983. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a plaintiff seeking to subject a municipality to § 1983 liability for the actions of its officers "must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). The Sixth Circuit Court of Appeals has recognized at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom: "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* (citing cases). Plaintiffs' allegations touch on two of these avenues: inadequate training and acquiescence of federal rights violations through failure to discipline. (*See* doc. 26 ¶¶ 30, 31, 45, 46.)

### a. Inadequate Training

Plaintiffs' Complaint does not specify with particularity the grounds of their failure-to-train claim. However, their memorandum in opposition to Defendants' motions clarifies their allegation: that the Defendant municipalities failed to adequately train their officers with respect to their joint operations and with respect to psychiatric emergency, or "Code 9," calls.[11]

---

to respond to the injured party for his injuries.").

[11] Plaintiffs claim that Amanda Morrison was "Code 9" and required, but did not receive, a "different approach" from the Township officers; and that although Dennis Morrison was *not* "Code 9," the Township's training deficiencies in dealing with Code 9s violated *both* Dennis and Amanda Morrison's constitutional rights. (Doc. 87-2 at 26.)

Defendants move for summary judgment on the basis that there is no evidence that Defendants acted with deliberate indifference to Plaintiffs' rights. Specifically, Defendants assert that proof of a single incident is inadequate to impose liability on a municipality, and that a municipality cannot be liable for failure to train unless there is a specific training program and prior instances of constitutional violations have demonstrated a deficiency in that training program.

The Supreme Court has recognized that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388 (emphasis added). In other words, a claim of failure to properly train or supervise under section 1983 cannot be based on simple negligence. *Hays v. Jefferson County*, 668 F.2d 869, 872 (6th Cir. 1982). "A failure to train amounts to 'deliberate indifference' where state actors should have known, either because of a history of [constitutional rights] violations or because such likelihood was obvious, that [constitutional rights] violations were likely to result absent better training." *League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 729 (N.D. Ohio 2005) (citing *Harris*, 489 U.S. at 390, 390 n. 4). To succeed on their failure-to-train claim, Plaintiffs must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Upon review of all the evidence before it, the Court finds that Plaintiffs have not met their burden of demonstrating that the Hamilton County Sheriff's Department or the Green Township Police Department demonstrated deliberate indifference to the rights of the Plaintiffs.

17

Even assuming that the officers' training in dealing with Code 9s was inadequate, thus satisfying the first element of proof, Plaintiffs failed to produce any evidence that such inadequacy resulted from the Defendants' deliberate indifference.

Plaintiffs seek to support their claim with deposition testimony of the officers and the affidavit of their expert, Dr. Kirkham.  Lieutenant West of Green Township testified that the Green Township field training officers "don't necessarily have any specialized training" to deal with Code 9s even though a Code 9 required a different approach than an ordinary citizen. (West Dep. at 66.)  He also testified that the Township's use-of-force policy made no distinction in dealing with Code 9s as opposed to other types of calls.  (*Id*. at 67.)  Dr. Kirkham, relying on deposition transcripts of Sergeant Eagle and Lieutenant Coyle concerning the lack of standard practices for handling emotionally disturbed persons, opined that the Defendants' "failure . . . to provide regular in-service training to their sworn personnel regarding the proper reaction to emotionally disturbed individuals and the importance of avoiding unnecessary physical force during such encounters was a significant and proximate cause of the injuries suffered by the plaintiffs in the instant case."  (Kirkham Aff. ¶ 12.)  Conspicuously absent from Plaintiffs's pool of evidence are complaints by other persons against the Hamilton County Sheriff's Department or the Green Township Police Department with respect to their responses to Code 9s.

Taken together, the officers' testimony that the Defendant Departments do not provide specialized training to the officers regarding Code 9s and Dr. Kirkham's opinion that this lack of regular training on the subject caused Plaintiffs' injuries are insufficient under Sixth Circuit

precedent to create a genuine issue for trial.[12]  Plaintiffs' proffered proof does not demonstrate

either "a history of [constitutional rights] violations" or an obvious "likelihood . . . that

[constitutional rights] violations were likely to result absent better training."  *League of Women*

*Voters of Ohio*, 432 F. Supp. 2d at 729.  Therefore, Plaintiffs have failed to demonstrate a triable

issue of fact that any inadequacies in training were the result of the Hamilton County Sheriff's

Department's and the Green Township Police Department's deliberate indifference to the rights

of the Plaintiffs.

> b.    *Failure to Investigate Use of Force/Ratification*

Plaintiffs allege that Hamilton County and Green Township failed to discipline their

officers for violations of the constitutional rights of citizens.  Plaintiffs also claim that the joint

operation agreement between Hamilton County and Green Township, which fails to specify a

single, uniform policy with respect to investigation of use of force, ratifies a practice of failing to

investigate an officer's use of force when officers from both departments respond to one scene.

Hamilton County moves for summary judgment on the grounds that, not only did it review the

---

[12]  Plaintiffs seek to analogize this case to *Russo v. City of Cincinnati*, a failure-to-train case in which the court found that "[r]eliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the [defendant] itself."  953 F.2d 1036, 1047 (6th Cir. 1992).  However, this case is more synonymous with *Trent v. Hawkins County*, in which the court found that the affidavit of the plaintiff's expert–also Dr. Kirkham–was insufficient to show that the municipality's alleged training deficiency was "so obvious and so likely to cause constitutional violations that a jury could properly have found 'deliberate indifference' on the part of [the defendants]."  106 F.3d 402, 1997 WL 35574 at *3.  Expressly distinguishing *Russo*, the *Trent* Court noted that "Dr. Kirkham's affidavit is essentially all the plaintiff has," whereas in *Russo* the plaintiff also presented as evidence a report from the Office of Municipal Investigation in which the city's own investigators concluded that the training was inadequate.  *Id*. at *5-6.  As in *Trent*, Dr. Kirkham's affidavit is all the evidence Plaintiffs have with respect to whether the alleged deficiencies in training demonstrated deliberate indifference by the Defendants.

use of force used in the Morrison incident and conclude that it was proper, any failure to investigate use of force in this case could not be the "moving force" behind the constitutional deprivation alleged by the Plaintiffs. Green Township argues that, notwithstanding the fact that it did not investigate the use of force in the Morrison incident, there is no evidence that the Township's policies regarding use of force investigations were the "moving force" behind the alleged constitutional deprivations.

A municipality may be held liable under § 1983 where the responsible law enforcement official has "ratified" unconstitutional conduct by completely failing to investigate a citizen's complaints of constitutional violations. *Marchese v. Lucas*, 758 F.2d 181, 188-89 (6th Cir. 1985). In *Marchese*, a prisoner was twice beaten while in the presence and custody of the police. Upon seeing the prisoner's condition, the district court judge ordered the sheriff's representative to investigate who and what had caused the injuries. The sheriff failed to undertake any investigation, and the court concluded that this failure "served to confirm the existence of an unstated 'policy' of toleration of illegal brutality toward any county prisoner who had threatened the life of a sheriff's deputy." *Id.* at 184. Similarly, in *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), the court found that a sheriff's failure to investigate an incident of abuse of a paraplegic inmate demonstrated a policy or custom of deliberate indifference to the needs of paraplegic inmates. Lending to the court's conclusion was the fact that at least fourteen other paraplegics had received similar deplorable treatment and that "the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County as an entity can be held liable here. . . ." *Id.* at 1248.

However, a municipality's failure to investigate claims of wrongful conduct does not *per se* mandate a conclusion that the municipality has a policy of tolerating violations of citizens' rights. Recalling the tenet pronounced in *Monell*, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, to be liable under a ratification theory, the municipality's failure to investigate must be indicative of an official policy. In other words,

> *Marchese*, read in light of *Monell* and its progeny, makes a post-injury failure to investigate *a fact which may permit an inference* that the misconduct which injured the plaintiff was pursuant to an official policy or custom. Any other reading would permit *respondeat superior* liability for the failure to undertake an investigation and would thus by-pass the stringent proximate cause requirements discussed in [*City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985) and *City of Springfield v. Kibbe*, 480 U.S. 257 (1987).]

*Tompkins v. Frost*, 655 F. Supp. 468 (E.D. Mich. 1987) (emphasis added). Furthermore, inferring a municipal-wide policy based solely on one instance of potential misconduct runs dangerously close to "the collapsing of the municipal liability standard into a simple *respondeat superior* standard." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005) (concluding that plaintiffs "must show not only that the investigation was inadequate, but that the flaws in th[e] particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause [of the claimed injury]"); *see also Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (finding that summary judgment for the municipality was proper where plaintiffs produced no evidence

indicating that the city had in the past failed to investigate and discipline the use of excessive

force by its police personnel where such discipline was justified).

Unlike in *Marchese* and *Leach*, there is no evidentiary basis in this case to support a

conclusion that the Defendant municipalities' failure to investigate the use of force against the

Morrisons demonstrated a policy or custom of deliberate indifference to the rights of citizens.

Neither Amanda nor Dennis Morrison ever filed any type of complaint with either the Hamilton

County Sheriff's Department or the Green Township Police Department.  Thus, neither of these

Defendants were aware that the Morrisons believed that they were treated improperly.  The

Defendants cannot be said to have a policy of ratifying unconstitutional conduct by failing to

properly investigate a complaint when no complaint was made.

Plaintiffs produce no evidence whatsoever of a pattern of insufficient investigation into

use of force by either municipal Defendant.  Rather, Plaintiffs dedicate their briefing primarily to

a recitation of Green Township's Use of Force Policy, which provides that "[w]henever it

becomes necessary to use force that results in injury to any person or could result in the claim of

injury," the subjects of the force will be interviewed, the officer who used force will make a

report to the appropriate supervisor, and an investigation will be conducted.  (Use of Force

Policy, Eagle Dep. Ex. D.)  In apparent contradiction to this policy, Green Township never

interviewed or examined Amanda or Dennis Morrison in connection with the incident.

Township officer Lieutenant Bart West also testified that "[t]here is no formal policy to

determine if an [internal] investigation should take place" concerning an officer's use of force.

(West Dep. 60.)

22

Plaintiffs' proffered evidence falls far short of creating an issue of fact sufficient to usher this claim to a jury for determination. While mindful of the fact that a municipality's failure to investigate an officer's use of force may create an inference that the alleged misconduct was pursuant to an official policy or custom, no such inference is warranted in this case. With regard to Hamilton County, evidence shows that a use of force report was completed and that the reviewer concluded that the use of force was appropriate under the circumstances. Had the Morrisons filed a complaint with the Department, an internal investigation would have ensued. However, the Morrisons filed no such complaint. This policy cannot be said to demonstrate deliberate indifference to the rights of the Morrisons. With regard to Green Township, the supervising officer apparently did not investigate the use of force in the manner specified by the Township's written policy. However, there is no evidence that failure to follow the written policy in this case caused the constitutional injury that Plaintiffs allege–excessive use of force in a Code 9 situation.

This case is plainly distinguishable from *Marchese* and *Lucas*, discussed above: not only did Plaintiffs not complain to the Defendant Departments concerning their treatment, they produce no evidence of any other instances of the Defendants failing to investigate use of force in a Code 9 scenario. Furthermore, Plaintiffs' claim that the joint operating agreement itself ratifies a policy of failing to investigate use of force is pure speculation, there being no evidence in the record to indicate any prior complaint implicating the joint operating agreement or any pattern of excessive use of force arising out of cases where officers from both departments arrive on the same scene. In no way can the facts of record support a finding in this case that Hamilton County or Green Township have a policy, custom, or practice of failing to discipline their

officers for constitutional violations.  The Court therefore must grant Defendants' motions for summary judgment on Plaintiffs' § 1983 claims against the municipalities.

### 2. Claims Against Defendants Luke and Eagle in their Supervisory Capacities

Plaintiffs claim that Defendants Luke and Eagle, respectively the Hamilton County and Green Township supervisory officers on the scene, are liable under § 1983 because they directly participated in the constitutional deprivation against Dennis Morrison and authorized, approved, and acquiesced in unconstitutional conduct of their subordinates.  Specifically, Plaintiffs claim that Defendant Luke ordered the removal of Dennis Morrison from the scene without probable cause, and that Defendant Eagle "countenanced the behavior of Defendants Hopewell and Celender" and directly participated in handcuffing of Dennis Morrison.  (Doc. 87-2 at 31.)

A supervisor can be held liable under § 1983 only if he "encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), cert. denied, 469 U.S. 845, 105 S. Ct. 156, 83 L. Ed. 2d 93 (1984).  "Merely having the right to control employees is not enough . . . , nor is merely being aware of the misconduct."  *Learn v. Daeschner*, 228 F.3d 729, 740 (6th Cir. 2000) (citing *Monell*, 436 U.S. at 694, *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir.1996)).

Lieutenant Luke's alleged involvement in the incident was to order Deputy Hopewell to remove Dennis Morrison from the area where Amanda Morrison was being treated by paramedics.  Lieutenant Luke did not order Hopewell to take Dennis Morrison into custody or place him under arrest, and he did not order Hopewell to do anything that might violate Dennis

24

Morrison's constitutional rights.  There is no evidence that Lieutenant Luke knew or should have known what happened between Morrison and Hopewell after he gave Hopewell the order to remove Morrison from the scene.  Thus, even if Hopewell or any other officer on the scene violated Dennis Morrison's constitutional rights, there is no evidence to support a claim that Lieutenant Luke is liable under § 1983 in his supervisory capacity for any such violation.

Sergeant Eagle's alleged involvement in the incident was to be present on the scene and to participate in Dennis Morrison's handcuffing.  However, Plaintiffs' recitation of facts in their opposition memorandum (doc. 87-2 at 2-9) makes no mention of Sergeant Eagle's participation in the events on the date in question.  Plaintiffs' expert, Dr. Kirkham, states in his affidavit that Hopewell handcuffed Dennis Morrison "with the assistance of Sgt. Eagle and Officer Celender." (Doc. 87 ¶ 9.)  However, this evidence falls far short of demonstrating a question of fact as to whether Sergeant Eagle encouraged any alleged misconduct of his subordinate officers, participated in any unconstitutional conduct, or knowingly acquiesced in any unconstitutional conduct.  Without more, the mere allegation of a supervisory officer's participation in a handcuffing does not subject that officer to liability under § 1983.  The Court thus grants Defendants' motions for summary judgment on Plaintiffs § 1983 claims against Luke and Eagle in their supervisory capacities.

### 3.    Claims Against the Officers in their Individual Capacities[13]

---

[13]  The Green Township Defendants state in their motion that Amanda Morrison does not state a claim against any individual Green Township police officer, citing ¶¶ 33-37 of the Amended Complaint.  (Doc. 74 at 21.)  The Court cannot reconcile this statement with the document of record: ¶ 33 of the Amended Complaint (doc. 26-2) states that "Defendants have deprived Plaintiff Amanda Morrison of the rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983, and 42 U.S.C. § 1988."  Green Township Officers Celender and Eagle are named defendants in their individual

Plaintiffs assert § 1983 claims against the defendant officers for use of excessive force and violation of due process. Defendants move for summary judgment on the basis that they are entitled to qualified immunity. Under the doctrine of qualified immunity, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When the defense of qualified immunity is raised in the context of a summary judgment, the plaintiff faces two hurdles. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). First, the plaintiff must show that the facts alleged and the evidence produced, when viewed in a light most favorable to the plaintiff, show that the officer's conduct violated one or more of the plaintiff's constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Russo*, 953 F.2d at 1043. Next, the plaintiff must "allege facts sufficient to indicate that the act in question violated *clearly established law* at the time the act was committed." *Russo*, 953 F.2d at 1043; *see also Saucier*, 533 U.S. at 200. "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (internal citation omitted).

Plaintiffs' Complaint asserts that the officers violated Amanda and Dennis Morrison's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. However, Plaintiffs'

_____

and official capacities, thus Amanda Morrison's § 1983 claim is stated against them.

opposition memorandum addresses only the alleged violation of rights secured by the Fourth

Amendment, namely, the right to be free from unreasonable search and seizure and to be free

from the use of excessive force.  (Doc. 87-2 at 11-12, 20.)[14]  This is perhaps an implicit

acknowledgment that claims of excessive force in the context of an arrest or other seizure should

be analyzed under the Fourth Amendment's "objective reasonableness standard," not under

substantive due process principles.  *Graham v. Connor*, 490 U.S. 386 (1989); *see also Phelps v.

Coy*, 286 F.3d 295, 299 (6th Cir. 2002) ("If the plaintiff was a free person at the time of the

incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff,

the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard.").

Thus, Plaintiffs' § 1983 claim against the officers in their individual capacities is that of an

alleged unreasonable seizure and application of force in violation of the Fourth Amendment.

> a.      *Unreasonable Seizure of Amanda Morrison*

Plaintiffs claim that Officers Celender and Hopewell lacked probable cause to effect a

mental health seizure of Amanda Morrison.  Plaintiffs cite *Fisher v. Harden*, 398 F.3d 837 (6th

Cir. 2005) for the proposition that "[a]n alleged mental health seizure without probable cause

constitutes a violation of an individual's Fourth Amendment rights."  (Doc. 87-2 at 13.)

Plaintiffs then cite *State v. Ratcliff*, 95 Ohio App. 3d 199, 205, 642 N.E.2d 31 (Ohio App. 1994)

for its description of probable cause, namely, that it requires facts and circumstances "sufficient

[sic] strong to warrant a prudent person in believing that an accused person had committed or

was committing a criminal offense."  (Doc. 87-2 at 13.)  Plaintiffs' reliance on the probable

---

[14]  Plaintiffs assert in their opposition memorandum that Dennis Morrison has a First
Amendment right against free speech retaliation.  (Doc. 87-2 at 19.)  However, the Amended
Complaint states no such claim.  (Doc. 26-2 ¶ 48.)

cause standard set forth in *Ratcliff* is misguided under the circumstances. *Ratcliff* pertained to a police officer's traffic stop of a motor home that was weaving in and out of its lane, thus giving rise to the officer's suspicion that the motor home was being operated by a driver who was under the influence of alcohol or drugs. *Id*. at 204. As *Fisher v. Harden* makes clear, the probable cause standard applied to mental health seizures is distinguishable from that applied to seizures where criminal activity is suspected:

> [I]n the context of a mental health seizure an officer must have probable cause to believe that the person seized poses a danger to himself or others. . . . A showing of probable cause in the mental health seizure context requires only a "probability or substantial chance" of dangerous behavior, not an actual showing of such behavior. . . . [A] mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental health condition. . . . Courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official.

398 F.3d at 842-43.

The evidence in this case demonstrates that Green Township Officer Celender and Hamilton County Deputy Hopewell,[15] the officers directly involved in taking Amanda Morrison into custody, had probable cause to believe that Amanda posed a danger to herself and thus did not violate Amanda's constitutional rights. The officers responded to the dispatcher's call that a suicide threat had been made. When Deputy Hopewell arrived at the scene, he found Amanda Morrison outside her home, without shoes or coat despite the cool temperature. When asked if

---

[15] The Hamilton County Defendants argue that Deputy Hopewell's decision to take Amanda into protective custody and his assistance in handcuffing Amanda did not constitute a "seizure" triggering Fourth Amendment protections. For the purposes of the Defendants' motions for summary judgment only, the Court will assume without deciding that Deputy Hopewell's conduct constituted a "seizure."

she had threatened suicide, Amanda admitted to Deputy Hopewell that she had told her mother she could "just kill herself."  It was under these circumstances that Deputy Hopewell and Officer Celender conferred and determined that Amanda should be taken to the hospital for an evaluation.  These facts–undisputed by the Plaintiffs–are sufficient grounds for a conclusion that a reasonable and objective official in the officers' situation would have had probable cause to conclude that Amanda posed a danger to herself.

Further bolstering this conclusion is the fact that Ohio statute provides that a police officer may take a person into custody and transport him or her to a hospital if the officer (1) has reason to believe that the person is a "mentally ill person subject to hospitalization by court order" under Ohio Revised Code section 5122.01(B)[16] and (2) represents a substantial risk of

---

[16]

"Mentally ill person subject to hospitalization by court order" means a mentally ill person who, because of the person's illness:

(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community; or

(4) Would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.

Ohio Revised Code § 5122.01(B).

physical harm to self or others if allowed to remain at liberty pending examination. Ohio Rev.

Code § 5122.10. Evidence of a threat of suicide is one of the statutory bases for subjecting a

mentally ill person to hospitalization. Ohio Rev. Code § 5122.01(B)(1). Thus, a reasonable and

objective person in Deputy Hopewell's[17] or Officer Celender's position–namely, an officer

familiar with the Ohio Revised Code pertaining to emergency hospitalization and the facts that

someone at Amanda's house called 911 and Amanda threatened suicide–could conclude that

Amanda posed a danger to herself. Accordingly, the officers had probable cause for a mental

health seizure and did not violate Amanda's constitutional rights when they seized her.

b.     *Excessive Force Against Amanda Morrison*

In addition to their allegation that the officers lacked probable cause to seize Amanda

Morrison, Plaintiffs claim that the officers used an impermissible degree of force against her.

Plaintiffs point to the events as demonstrating the use of excessive force against Amanda

Morrison: Officer Celender tackled Amanda from behind, in what he described as "steer wrestler

fashion," as she walked toward her house;[18] Officer Celender refused to loosen Amanda's

handcuffs when she told him they were on too tight; and Officer Celender pushed Amanda's face

into the ground four or five times as she tried to speak. (Doc. 87-2 at 17-18.) Plaintiffs direct

the Court to no specific factual allegations concerning any other officer's use of force against

---

[17]  The Hamilton County Sheriff's Office in particular has a Special Order discussing implementation of Revised Code § 5122.10. *See* Special Order No. P-02-004, Coyle Dep. Ex. 2.

[18]  Officer Celender described his actions as follows: "I took her this way (indicating) and started to grab her off balance. I kicked out my right leg almost into a baseball slide, came down on my right . . . side, my right hip, okay, which brought her down on her stomach. . . . She more or less slapped forward right onto her stomach and her chest." (Celender Dep. 270-71.)

Amanda.  Amanda was treated for an ankle sprain and contusion following the incident.  (Doc. 87-3.)

"The use of excessive or unreasonable force by police officers in the exercise of their authority gives rise to a § 1983 cause of action."  *Russo,* 953 F.2d at 1044.  Again, in determining whether the defendant officers are entitled to qualified immunity, the Court must first determine whether the facts viewed in the light most favorable to Plaintiffs show that a constitutional violation has occurred.  *See Feathers,* 319 F.3d at 848.  The question of whether an officer used excessive force is analyzed under an objective reasonableness standard, requiring the Court to consider whether the force used to subdue Amanda Morrison was reasonable from the perspective of a prudent officer on the scene.  *See Greene v. Barber*, 310 F.3d 889, 898-99 (6th Cir. 2002).  This is a fact-specific inquiry that depends on factors such as (1) the severity of the crime at issue, (2) whether the suspect poses a threat to anyone, and (3) whether the suspect is attempting to escape or is resisting arrest.  *Graham v. Connor*, 490 U.S. 386, 396 (1985); *Patrick v. City of Detroit*, 906 F.2d 1108, 1115 (6th Cir. 1990).

The Court will separately analyze the three events isolated by Plaintiffs: the tackle, the application of handcuffs, and the head pushing.  With regard to the tackle, the first factor weighs against the application of force as Amanda was not suspected of committing a crime but was being seized for the purpose of a mental health evaluation.  As to the second factor, the Officers had probable cause to believe that Amanda posed a threat to herself; however, the threat was not imminent because she had no weapon or other means of doing immediate harm to herself. Finally, taking as true Plaintiffs' version of the facts, Amanda was merely walking toward her home, not running, when Officer Celender tackled her.  According to Amanda, when Officer

31

Celender tackled her, she felt a pop in her ankle, and then her knees, chest, and forehead hit the ground.  (A. Morrison Dep. 102.)

When viewed in a light most favorable to Plaintiffs, these allegations show that Officer Celender's conduct violated Amanda Morrison's constitutional right to be free from excessive force.  It was not objectively reasonable for the officer to tackle a woman wearing platform shoes who was calm and oriented and walking across a yard toward her house when she was not suspected of committing a crime, was not posing an imminent threat of harm to others or herself, and was not fleeing to evade arrest.

The facts of this case are manifestly unlike those in cases where tackling a suspect has been found to be within the boundaries of reasonable application of force.  *See*, *e.g.*, *Lyons v. City of Xenia*, 417 F.3d 565, 578 (6th Cir. 2005) (finding that tackling of plaintiff did not amount to excessive force when the officer responded to a distressed call for backup help from a fellow officer and entered the house to find the plaintiff and the officer in close proximity and yelling at each other); *McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908-09 (8th Cir. 2005) (holding that tackling did not amount to excessive force given that "[plaintiff] was disoriented and exhibiting signs of lacking mental control, that he was barreling toward glass doors that [the police officer] knew did not open, and the rapid pace of events as [the police officer] raced to reach [the plaintiff].")  Rather, the facts of this case are analogous to those cases where tackling has risen to the level of excessive force.  *See*, *e.g.*, *Phelps*, 286 F.3d at 298 (finding a constitutional violation for summary judgment purposes where plaintiff alleged that officers tackled him, hit him, and slammed his head into the floor three times); *Meredith v. Erath*, 342

F.3d 1057, 1061 (9th Cir. 2003) (holding that it was objectively unreasonable to throw a lone woman to the ground for protesting a search warrant served by twelve IRS agents).

However, moving to the second prong of the qualified immunity analysis, Plaintiffs have not shown that the law on October 30, 2002, the time of the incident, clearly established that Officer Celender's conduct would violate the Constitution.  There are two paths for showing that an officer was on notice that his or her actions violated a constitutional right: (1) where the violation was "obvious" under the standards, even in the absence of a body of relevant case law, and (2) where the violation is shown by a failure to adhere to a body of precedent that "squarely governs" the case. *Lyons*, 417 F.3d at 579 (*quoting Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004)).  "'[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.'"  *Saucier v. Katz*, 533 U.S. 194, 2002 (2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

The manner in which Officer Celender tackled Amanda was not objectively reasonable under the circumstances.  However the constitutional violation cannot be said to be an obvious one, that standard being satisfied by acts such as the use of deadly force to stop a fleeing suspect who posed no immediate threat to the officer and no threat to others.  *See*, *e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.")  Neither is the Court aware of any precedent that squarely governs the case here, namely, the level of force appropriate to effect a mental health seizure when the person posed a non-immediate but

33

substantial risk of harm to herself.[19]  Thus, it cannot be said that Officer Celender "had fair notice that [his] conduct [of tackling her as she walked away from him] was unlawful." *Brosseau*, 543 U.S. at 198.

The same cannot be said, however, with respect to the allegations that Officer Celender refused to loosen Amanda Morrison's handcuffs even after she and her mother complained that they were too tight.  "The right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001)).  As plainly put by the Sixth Circuit Court of Appeals, "[o]ur precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's peals that the handcuffs were too tight." *Id*.

In this case, Cynthia Morrison testified that Officer Celender "had [the handcuffs] to the point where [Amanda's] skin was all pinched over and it was turning black and blue."  (C. Morrison Dep. 52.)  Amanda Morrison testified that she, like her mother, told Officer Celender that the handcuffs were too tight, but that Officer Celender refused to loosen them.  (A. Morrison Dep. 118.)  Because Plaintiffs alleged that Amanda sustained some physical injury from the handcuffing (pinched skin) and that Officer Celender ignored her complaint that the handcuffs were too tight, she has sufficiently demonstrated that she is entitled to present the issue to a jury.

_____

[19]  The Court points out that the Officers could reasonably have believed that Amanda Morrison posed a "substantial threat of harm" to herself, sufficient to entitle them to make a mental health seizure pursuant to Ohio Rev. Code § 5122.01(B), even though the threatened harm was not so imminent that tackling her was a constitutionally valid use of force.  *Cf. McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908-09 (8th Cir. 2005), where the officer was found to be justified in tackling the plaintiff, who was disoriented and exhibiting signs of lacking mental control and was barreling toward glass doors that the officer knew did not open.

*Lyons v. City of Xenia*, 417 F.3d 565, 575-76 ("In order to reach a jury on this claim [of tight handcuffing], the plaintiff must allege some physical injury from the handcuffing, *see Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001), and must show that officers ignored plaintiff's complaints that the handcuffs were too tight, *see Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002). . . .".)

Likewise, Officer Celender's pushing Amanda Morrison's head into the ground when she was handcuffed and not posing any threat to anyone was an unreasonable use of force.  An officer's use of force after a suspect has been incapacitated is excessive as a matter of law.  *See*, *e.g.*, *Phelps v. Coy*, 286 F.3d 295, 301-02; *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988); *Darnell v. Caver*, 156 F.3d 1229, 1998 WL 416000 at *3 (6th Cir. 1998).  More particularly, it was clearly established at the time of the occurrence that pushing a handcuffed person's head into the ground constituted an unreasonable use of force.  *See*, *e.g.*, *Phelps*, 286 F.3d at 301 (holding that slamming arrestee's head into the floor after he was subdued constituted excessive force); *Darnell*, 1998 WL 416000 at *3 (holding that hitting plaintiff's head on the ground constituted excessive force). Accordingly, Officer Celender is entitled to qualified immunity on Plaintiffs' claim that he used excessive force against Amanda Morrison when he tackled her, but he is not entitled to immunity with respect to the claims that he failed to loosen her handcuffs and that he repeatedly pushed her head into the ground after she had been subdued.

        c.    *Excessive Force Against Dennis Morrison*

Plaintiffs' memorandum in opposition to Defendants' motions for summary judgment suggests that the Defendants violated Dennis Morrison's First Amendment right against free

speech retaliation, his Fourth Amendment right to be free from the use of excessive force, and his Fourth Amendment right to be free from detention without probable cause.  (Doc. 87-2 at 19.)  Plaintiffs do not raise a First Amendment claim in their Complaint, thus the Court is not at liberty to consider any such argument.  Further, as Dennis Morrison plead no contest to a charge of disorderly conduct, he has no basis for claiming that the officers lacked probable cause to detain him.  *Walker v. Schaeffer*, 854 F.2d 138 (6th Cir. 1988) (holding that no contest plea would be given collateral estoppel effect to estop state court defendants from asserting in federal court that defendant police officers acted without probable cause in arresting and imprisoning them, in action alleging false arrest and/or false imprisonment, and officers were entitled to qualified immunity).  Accordingly, the Court need only consider the constitutionality of the force used against Dennis Morrison during his arrest.

Plaintiffs allege that the force used against Dennis Morrison was excessive in three respects: (1) Officer Celender poked and pushed Dennis when he first arrived at the scene, telling Dennis repeatedly to "shut up"; (2) Lieutenant Luke ordered Deputy Hopewell to remove Dennis from the scene; and (3) the Defendants took Dennis to the ground and, in addition to placing the handcuffs on Dennis too tightly, fractured Dennis' finger.  (Doc. 87-2 at 20.)  The only case law Plaintiffs cite in reference to Dennis Morrison's excessive force claim concerns the right to be free from excessively forceful handcuffing.  (*Id.* (citing *Ferguson v. Hall*, 33 F. Supp. 2d 608 (E.D. Mich. 1999); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167 (6th Cir.

2004).)  Indeed, given the *Graham* three-part test for evaluating the reasonableness of an officer's use of force, only the takedown and handcuffing warrant further discussion.[20]

"It is well established that the handcuffing of a suspect incident to a lawful arrest is constitutional."  *Solomon*, 389 F.3d at 175 (Rogers, J., dissenting) (citing *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001)).  In the state court proceedings, Dennis Morrison pleaded no contest to the charge of disorderly conduct.  Thus, the officers' act of handcuffing Dennis Morrison was constitutional.  The Court must, however, examine whether the force used to effect the handcuffing was objectively unreasonable.

The crime for which Dennis Morrison was being arrested was disorderly conduct.  While disorderly conduct is not on the "severe" end of the criminal conduct spectrum, the officers testified that they were concerned that Dennis Morrison's conduct was distracting the officers' and paramedics' attention away from Amanda Morrison.  Thus, a reasonable officer could have concluded that some amount of force was warranted.  As far as whether Dennis posed a threat to anyone, Deputy Hopewell testified that when he tried to escort Dennis Morrison from the scene, Dennis "spun around and came towards me in an aggressive manner."  (Hopewell Dep. 113.)  While Dennis Morrison does not admit to having made any aggressive move, he did admit during his deposition that when he asked Deputy Hopewell why Officer Celender needed to be present, Hopewell answered, "Well, he's here for my safety."  (D. Morrison Dep. 48.)  Given Deputy Hopewell's comment at the time and his later testimony, it is clear that he perceived a

--------

[20]  While Officer Celender's decision to poke and push Dennis Morrison may have been inconsiderate and upsetting, it falls short of an unconstitutional application of force under the circumstances, and Lieutenant Luke's command to remove Dennis was not an application of force at all.

threat from Dennis Morrison. Finally, while Dennis Morrison testified that he was not resisting arrest, he did admit that he was unable to comply with the officers' order to put his arms behind his back because of the awkward position in which he was pinned to the ground. (D. Morrison Dep. 65.) Given Dennis Morrison's admitted failure to put his hands behind his back as ordered, a reasonable officer could have perceived that Morrison was resisting arrest. Dennis Morrison sustained "a small oblique fracture, proximal portion of the second middle phalanx" which was treated by splinting. (Doc. 87-3.)

The Supreme Court has cautioned against the "20/20 vision of hindsight" and noted that if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (citing *Graham*, 490 U.S. at 396). Even when viewed in a light favorable to Dennis Morrison, the facts do not demonstrate that a constitutional violation occurred. Cases in which courts have found handcuffing to be excessively forceful typically involve more serious injury to the plaintiff and less provocation than is the case here. *See, e.g.*, *Solomon*, 389 F.3d at 174 (finding that officer was not entitled to qualified immunity when arrestee was cooperating and was surrounded by her children, arrestee bore no weapon, officer was at least three inches taller and 120 pounds heavier than arrestee, and the officer attempted to knock arrestee to ground and twisted arrestee's arm behind her back with enough force to cause several fractures requiring surgery); 167 *Ferguson*, 33 F. Supp. 2d at 613 (finding that officer was not entitled to qualified immunity when arrestee asked to be handcuffed in front because his arm had previously been broken and was deformed, and the officer denied the request, pulling arrestee's arm behind his back and breaking it).

38

In this case, a reasonable officer could have concluded that directing Dennis Morrison away from the scene, taking him to the ground, and handcuffing him was within the bounds of appropriate conduct.  Accordingly, the officers did not violate Dennis Morrison's constitutional rights, and the officers in their individual capacities are entitled to summary judgment on Dennis Morrison's § 1983 claims against them.

### C.      Plaintiffs' Claims Under Ohio Law

Finally, the Court turns to Plaintiffs' remaining state law claims for assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, outrageous conduct, invasion of privacy, civil conspiracy, negligence, gross negligence, and negligent hiring, retention, and supervision.  Defendants move for summary judgment as to all state law claims on statutory immunity grounds.  Ohio Rev. Code § 2744.02(A)(1) provides that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  There are certain exceptions to this broad grant of immunity, as specifically described in § 2744.02(B); however, none apply to the instant case.  As to Plaintiffs' claims against the individual Defendants, Ohio Rev. Code § 2744.03(A)(6) extends this immunity to all employees of a political subdivision unless one of the following exceptions applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal

penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Plaintiffs argue that Ohio Rev. Code §§ 2744.02 and 2744.03 violate Article I, Section 5 and Article I, Section 16 of the Ohio Constitution. Contrary to Plaintiffs' assertion, the Sixth Circuit has recently held that these statutes do not violate the Ohio Constitution. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 697 (6th Cir. 2006) ("The district court properly held that the Liability Act, Ohio Rev. Code §§ 2744.02, 2744.03, does not violate article I, sections 5 and 16, of the Ohio [C]onstitution because the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute."

In the alternative, Plaintiffs argue that the individual Defendant officers are barred from immunity because they committed acts "with malicious purpose, in bad faith, or in a wanton or reckless manner," citing Ohio Rev. Code § 2744.03(b). "Malice" is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (Ohio App. 1995). "Bad faith" involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another. *Id*. at 90-91. "Wanton misconduct" is the failure to exercise any care whatsoever. *Id*. at 91. Notwithstanding Plaintiffs' bare assertion that "reasonable minds can easily conclude the officers' behavior was with malicious purpose, in bad faith, or in a wanton or reckless manner," (doc. 87-2 at 35) there are no facts to support such a

40

claim.  Accordingly, the Court finds that Defendants are entitled to statutory immunity as to

Plaintiffs' state law claims.

**IV.    CONCLUSION**

For the foregoing reasons, the Court denies Plaintiffs' motion to strike, denies

Defendants' motion to strike, grants in part and denies in part the motion for summary judgment

of the Green Township Defendants, and grants the motion for summary judgment of the

Hamilton County Defendants.  Remaining for disposition is Amanda Morrison's § 1983 claim

against Officer Celender for excessive force arising out of his actions in handcuffing her and

pushing her head into the ground after she had been subdued.

IT IS SO ORDERED.




____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge